MINOT TIRRELL & others *vs.* ADDISON GAGE & others.
SAME *vs.* ABEL W. BOSWORTH & others.

The owners of a ship who have entered into an entire contract to carry a cargo of ice and deliver it to the consignees in good order and condition, excepting what may be lost by the natural waste of the article, at the port of New Orleans, the dangers of the seas only excepted, for a stipulated price payable on the delivery of the ice at New Orleans, cannot maintain an action against the owners or the consignees for the freight, if, before the arrival of the ship at her destination, she was forcibly taken possession of by an armed steamer of the so called Confederate States, and taken with the cargo to New Orleans, where the ice was afterwards condemned as lawful prize; although before the condemnation the consignees obtained possession of the ice seasonably and in good order, by a decree of the court, upon executing a bond, with sureties, with condition to pay the appraised value thereof if it should be condemned, which value they were afterwards compelled to pay.

Two actions of contract to recover for carrying a cargo of ice from Boston to New Orleans. The facts were agreed in this court; of which the following are all that are material, in addition to those stated in the opinion :

The plaintiffs, being the owners of the ship Abælino, entered into the following contract with the defendants in the first action : " Memorandum of an agreement made this 19th day of March 1861 between Addison Gage & Co. and the owners of the ship Abælino of Boston. Addison Gage & Co. hereby agree to load the said ship at East Boston or Charlestown with a full cargo of ice for New Orleans, say to fill the lower hold, and to load as much in the between decks as the owners of the ship require ; but give the owners the privilege at their option to load other goods in the between decks instead of ice. Addison Gage & Co hereby agree to pay at the rate of five dollars

per ton on the quantity of ice shipped, payable in cash upon the delivery of the cargo of ice at New Orleans, and to load and unload the ice and fixings. If other merchandise than ice is to be loaded in the between decks, it shall not detain the ship over four days. The owners of said ship hereby agree to the above price and conditions."

The bill of lading stated that the ice was shipped in good order and condition, and that it was " to be delivered in like good order and condition (excepting what may be lost by the natural waste of the article) at the aforesaid port of New Orleans, (the dangers of the seas only excepted,) unto Messrs. A. W. Bosworth & Co. or to their assigns, he or they paying freight for the said ice, five dollars per ton, with average accustomed."

After the capture of the vessel and the subsequent judicial proceedings, as recited in the opinion, the master made and signed his protest before a notary public, and demanded the freight money of the consignees. The first of the present actions was against the owners and consignors of the ice; and the second was for the same cause against the consignees. The two cases were argued together.

*C. W. Storey,* for the plaintiffs. The ice was duly delivered according to the contract. The capture was a piratical act, and did not change the property in the ship, cargo or freight. *St.* of U. S. of 1820, *c.* 113, § 3. Abbott on Shipping, 27. But it is not necessary to declare the capture piratical. It is enough that it was illegal, and that the property in the articles captured was in no respect changed by it. The Confederate States have no legal existence, and can give no authority to any person claiming under them. Const. of U. S. Art. 1, § 10; Art. 6. The owners are liable for the freight under the bill of lading alone. *Blanchard* v. *Page,* 8 Gray, 290, 293, 295, 300, and cases cited. *A fortiori,* under the charter party.

The ice was the property of the consignees; they received it from the ship according to the bill of lading, which also they had received, and the law will imply a promise by them to pay the freight fixed by the bill of lading. Abbott on Shipping, 423, 424, *n.*, 425, *n. Central Bridge Corp.* v. *Abbott,* 4 Cush. 473.

*J. G. Abbott,* for the defendants, cited *Hadley* v. *Clarke,* 8 T. R. 259; *Evans* v. *Hutton,* 4 Man. & Gr. 954; *Spence* v. *Chodwick,* 10 Q. B. 517; *Atkinson* v. *Ritchie,* 10 East, 530; *Liddard* v. *Lopes,* Ib. 526; *Scott* v. *Libby,* 2 Johns. 336; *Lorillard* v. *Palmer,* 15 Johns. 14; *Burrill* v. *Cleeman,* 17 Johns. 72; *Richardson* v. *Maine Ins. Co.* 6 Mass. 118; *Bradstreet* v. *Baldwin,* 11 Mass. 229; *Sampayo* v. *Salter,* 1 Mason, 43; *Caze* v. *Baltimore Ins. Co.* 7 Cranch, 358; *Cheriot* v. *Barker,* 2 Johns. 346; *Marine Ins. Co.* v. *United Ins. Co.* 9 Johns. 186; *Columbian Ins. Co.* v. *Catlett,* 12 Wheat. 383; *Gibson* v. *Philadelphia Ins. Co.* 1 Binn. 405; *Armroyd* v. *Union Ins. Co.* 3 Binn. 437; *The Tutela,* 6 Rob. Adm. R. 177; *The Hiram,* 3 Rob. Adm. R. 180; *Osgood* v. *Groning,* 2 Camp. 466; 2 Parsons Mar. Law, 569.

MERRICK, J. These are actions against the owners and consignees, to recover the freight alleged to have been earned in the carriage of a cargo of ice from Boston to New Orleans.

1. The ice belonged to Gage & Co., the defendants in the first of the above entitled actions, and was by them shipped in Boston on board the plaintiffs' vessel called the Abælino, under a written contract between the parties, the terms of which are fully set forth in the bill of lading. In and by these instruments the plaintiffs stipulated to transport the ice to New Orleans and there to deliver it to the consignees in like good order and condition as when received, the natural waste of the article and the dangers of the sea only excepted, and for this service the defendants promised to pay them, in cash, on such delivery, at the rate of five dollars per ton on the whole quantity shipped. This is an entire contract; and therefore, according to the general and elementary rule of law upon the subject, until the complete performance of the stipulated service by the plaintiffs, no right on their part to recover compensation for it could exist. *Liddard* v. *Lopes,* 10 East, 526.

Applying this rule to the facts which are admitted by the parties, it becomes apparent that the action against Gage & Co. cannot be maintained. It appears from the agreed statement of facts, that on the arrival of the Abælino off the mouth of the Mississippi, the ship, together with the cargo on board, was

seized and taken possession of as lawful prize by the officers of an armed steamer assuming to act, and to have the right to act, under the authority of the government of the so called Confederate States. The master and crew were immediately removed from the ship, and were thereafter held as prisoners of war ; and the captors, having thus obtained exclusive possession and control, caused the ship and cargo to be taken to New Orleans, where a libel was filed against them in a court called the Confederate States District Court for Louisiana. Pending these proceedings, Bosworth & Co., who had received from Gage & Co. the bills of lading, appeared as claimants of the ice, and by order of the court it was afterwards delivered to them, seasonably and in good order, as shown in the statement of facts, by the marshal, upon their giving bond with satisfactory sureties, by the terms of which they became bound to pay into court the appraised value of the ice, if the cargo should there be condemned as lawful prize. It was afterwards so condemned, and they were accordingly compelled to pay its value into said court, according to the condition of their bond. In this manner the plaintiffs were disabled and prevented from performing their part of the contract. The ice was taken from them by a force which they could not resist. They never regained possession of it, and consequently it was out of their power to deliver and they never did deliver it, according to the terms of their contract, to the parties to whom it was consigned.

But the plaintiffs contend that the government of the Confederate States cannot be recognized in this court as existing under any legitimate authority, and therefore that all the proceedings in the seizure of the Abælino, and in the course of the prosecution of the libel against her and her cargo, and in the compulsory payment of the money into court by Bosworth & Co., were unauthorized and lawless, and that all parties who were in any way concerned in promoting them were trespassers, against whom effectual remedies for the acts committed by them can and may be had in the courts of the United States, when the authority of the lawful government shall be again fully established. And they insist that as the ice did in fact, by means of

the acts of these several trespassers, reach its intended destination, and did thereby come seasonably into the hands and possession of the consignees to whom it was forwarded by the owners, they may avail themselves of these acts to show that the defendants thus obtained all the advantages which they could have derived from the most exact fulfilment of the contract by them, and therefore that they may justly claim payment of the stipulated compensation for their services.

It is undoubtedly a well settled principle of public law, that upon the occurrence of civil war, when one part of a nation attempts to separate itself from the other, and establish for itself an independent government, the newly formed nation cannot be recognized as such in the tribunals of other nations, much less in those of that against which it rebels, until it has been recognized by the sovereign power under which those tribunals are constituted. 1 Greenl. Ev. § 6. Such is the present condition of that section of our country, in which the people, or a portion of them, have organized a government under the name of the Confederate States. It is not recognized by the executive department of the government of the United States as a lawful organization, or as an independent state ; but all the territory embraced in that organization is claimed as a part of the territory of the United States, over which its jurisdiction is justly and exclusively to be exercised under the provisions of the national constitution. In our judicial tribunals, therefore, all the proceedings of the officers of the insurrectionary government of the Confederate States, and of persons professing to act under its authority, by which any property of our citizens is seized and attempted to be confiscated, must be regarded as wholly unwarranted and unlawful ; and all parties participating in the commission of those acts are to be considered and treated merely as trespassers.

It is a necessary consequence from this principle that, in determining the matters in controversy between the parties in the present suits, we are in this court to consider that the seizure of the Abælino and her cargo by the officers of the armed steamer, acting under a commission or letter of marque issued by a person

assuming to be the president of the Confederate States, was a mere act of wrong and violence, and wholly destitute of any legitimate authority. The plaintiffs, being in the prosecution of a lawful voyage, were entitled to the continued possession of the cargo, which, by virtue of their contract with the defendants, they were under obligation to convey and deliver at its port of destination, and upon which they had a lien for the freight which was then in the course of being earned. This gave them a special property in it; and they were therefore entitled to an action to recover its value against any and all persons and parties who had in any way coöperated in taking it from and depriving them of it.

But such an unlawful invasion of their rights does not afford any lawful excuse or constitute any legal justification for the non-performance of their contract with the owners of the cargo. Having received it under an agreement to carry it to a specified port of destination, they were bound absolutely to deliver it there, and upon their failure to do so they became responsible to the owners for its value, and could only resort for their own remedy to the wrongdoers by whom their voyage had been interrupted and broken up. They stipulated to deliver it at all events to the consignees at New Orleans, excepting only so far as they might be prevented from doing so by the natural waste of the article and the dangers of the seas. Under such an engagement, even if the voyage had been interrupted by legitimate authority, and the cargo in consequence of it had been lost, they would have been held to be accountable for it. Thus, where the owners of a ship received and contracted to carry a cargo from Liverpool to Leghorn, and were prevented from proceeding on the voyage by an embargo afterwards laid on all vessels, which was to be continued in force " until further orders of the board of privy council," it was held that the embargo did not dissolve, but only suspended, the performance of the contract; and that even after ten years, when the embargo was taken off, they were accountable in damages for not performing their part of the contract. It was incumbent on them, it was said by the court, to specify the terms and conditions on which they would carry the

plaintiffs' goods, and having engaged absolutely to carry them, the dangers of the sea only excepted, that was the only lawful excuse they could set up for an omission to fulfil their stipulations; for when a party by his own contract creates a charge upon himself, he is bound to make it good, notwithstanding any accident or inevitable necessity, because he might have provided against it by his contract. *Hadley* v. *Clarke*, 8 T. R. 259. The liability of the carrier begins with the reception of the goods, and continues until their delivery, according to the directions under which they were received. 1 Parsons on Con. 657.

It is not sufficient to entitle the plaintiffs to recover for the entire stipulated freight, or for a part of it in proportion to the distance for which the cargo was carried, that the property in the goods was not changed by the acts of the trespassers by whom it was seized and afterwards converted to their own use, or that the owners may have an action against them to recover its value. The stipulation of the plaintiffs was, not that they would so conduct themselves in the prosecution of the voyage and in the transportation of the ice that the owners should have a valid claim, or good cause of action, against others who should unlawfully become possessed of it, but that they would deliver it at all events to the consignees at the port of destination, saving only interruptions resulting from those causes expressly specified as exceptions. It was upon the single condition of the delivery of the cargo to the consignees, that the defendants promised to pay the designated price for the transportation. All the risks attending the transportation, and by which it might be hindered or altogether defeated, except in relation to the waste and dangers expressly provided for, were assumed by the carriers; and they made their right to have and recover compensation dependent upon the rendition of the service strictly according to the terms and conditions of the contract under which the property was taken into their possession. *Higginson* v. *Weld*, 14 Gray, 172.

The general rule that under an entire contract for the performance of specified services no compensation can be recovered until they are fully performed is indisputable. The plaintiffs do

not attempt to contest it. There are, however, well known exceptions to it. *Cutter* v. *Powell*, 6 T. R. 320 ; S. C. 2 Smith's Lead. Cas. (5th Amer. ed.) 41, note by Wallace. But upon the admitted facts in the present case, the claim of the plaintiffs does not come within any of those exceptions. There has been no waiver of their rights, and no consent or agreement, express or implied, on the part of the defendants, that the plaintiffs should be relieved from the complete performance of their contract by reason of its execution being prevented by the intervention of an unforeseen, overpowering unlawful force, or that the delivery of the ice should be dependent upon any condition not expressly provided for, or that a good cause of action against trespassers should in any event be substituted in lieu of it. Nor have the defendants, voluntarily or otherwise, derived any benefit from services actually performed in their behalf. They have never recovered possession of the ice, nor received anything in payment of its value. The consignees, finding the property at New Orleans in the hands of persons by whom it had been, as they believed, unlawfully seized, attempted to reclaim and save it for the owners. But they were unsuccessful in their efforts. They acted under a degree of duress which they could not, in the existing condition of public affairs, and in the midst of the disorder and violence of a civil insurrection, repel or avoid ;. and their efforts accordingly proved to be entirely unavailing. So that in fact, notwithstanding their well meant endeavors to regain it for the owners, the latter lost their property, and this without having received the least benefit from the services rendered in its transportation. And hence, because they have neither performed their contract, nor rendered services from which the defendants have derived any substantial advantage, it is apparent that the plaintiffs have no just or legal claim, and can maintain no action against them.

2. For the same reasons, it is obvious that the action against Bosworth & Co. must fail. As no freight was earned by the full performance of the contract with the owners of the ice, there is nothing due to the plaintiffs, and therefore nothing to be recovered in any form of action.

But if the claim asserted by them is considered in another aspect, and particularly in reference to Bosworth & Co. as consignees of the cargo, it will readily be seen that the plaintiffs have entirely failed to show that it can be sustained upon any principle of law, or that they ought to be permitted upon any principle of equity or justice, to maintain an action for its recovery. The law upon this subject is perfectly plain, and free from all doubt or uncertainty. Where there is no special contract between the carrier and the consignee, and the latter has no interest in the goods transported, his liability to pay the freight which has accrued arises, and can arise only, by implication from the acts and conduct of the parties. And hence it has become an established rule, applicable to all transactions, that he who accepts from another anything of value, whether it be real or personal estate, which he knows to be subject to a duty or a charge for which he is expected to pay, is presumed thereby to have impliedly contracted to take the duty or charge upon himself. *Boston & Maine Railroad* v. *Whitcher*, 1 Allen, 497. *Blanchard* v. *Page*, 8 Gray, 281. *Goodwin* v. *Gilbert*, 9 Mass. 510. *Swasey* v. *Little*, 7 Pick. 296. *Felch* v. *Taylor*, 13 Pick. 133. *Sheldon* v. *Purple*, 15 Pick. 528. *Newell* v. *Hill*, 2 Met. 180. And this is the only ground upon which, in the particular application of the rule to the case of goods carried for hire, a promise by the consignee to pay the freight is, or can be, implied in law, or upon which his legal liability therefor can be established. Now it is not pretended that Bosworth & Co. owned or had any interest whatever in the ice, or that they made any contract with the plaintiffs concerning it, or expressly promised to pay for its transportation to New Orleans. They cannot therefore be held responsible to the plaintiffs upon an implied promise, except by showing that they received and accepted the ice upon and under a delivery made to them in the expectation, reciprocally entertained, that they as consignees were to pay the freight which had accrued, and which then constituted a lien and charge upon it. But this, upon the undisputed facts in the case, has not been, and cannot be, shown; for there was no such acceptance on the one side, and no such delivery on the other. But Bosworth &

Co., by their own exertions, and without any aid or assistance from the plaintiffs, obtained it from the parties who had previously seized and dispossessed them of it, and afterwards withheld it from them under a pretended claim of right by the exercise of superior and irresistible force. It is wholly immaterial, in reference to the present question, that the claim so asserted is to be regarded in this court as a groundless and lawless pretension. All that is material or at all important here to be considered is, that the conduct and proceedings of the trespassers by whom the plaintiffs were deprived of the possession and control of the ice, and the power which they actually possessed and exerted, were such as to render an acceptance of it by Bosworth & Co. from the plaintiffs, or a delivery of it by them to the latter, an impossible thing. And it is accordingly agreed by the parties that nothing of this kind actually occurred. And consequently as it is conceded that Bosworth & Co. never promised, and that the essential facts from which an implication of a promise on their part to pay the freight can be legally presumed or deduced cannot be proved and never existed, it is an irresistible conclusion that there is no ground upon which the plaintiffs can maintain an action against them for its recovery.

But the plaintiffs contend that the actual possession of the ice by Bosworth & Co., under the circumstances already stated, is equivalent to a delivery of it to them according to the terms of the contract for its transportation with the owners; and that, as they were entitled under the provisions of the bill of lading to receive and take possession of it, and as they did actually obtain possession of it, and might thereby have realized all the advantages they could have enjoyed if it had been delivered to them directly by the plaintiffs, they cannot now be allowed to prove, or to defend themselves upon the ground, that they did not receive it from the plaintiffs under the bill of lading, or that by the possession they obtained they did not subject themselves to the same responsibilities which would have resulted from their acceptance of it upon its delivery by the carriers. And they further insist, that the defendants ought not, at any rate, to be permitted to set up in their defence that they did not have or

Tirrell & others *v.* Gage & others.

accept a delivery of the ice from the plaintiffs, because by their own acts in getting possession of it they prevented the plaintiffs from making any other delivery, and rendered the further and more complete performance of the contract on their part impossible.

To these assumptions, and the consequences deduced from them by the plaintiffs, the answer, that neither one of the propositions embraced in them is warranted by or in conformity with the admitted facts in the case, affords a decisive and complete refutation. And that the assertion upon which this answer is founded is strictly correct becomes obvious upon an examination and analysis of those facts; for it thus appears that the defendants gained no such advantage, and interposed no such hindrance, as those which the plaintiffs, in support of their positions, find it necessary to affirm. In the first place, it will be seen upon this examination that Bosworth & Co. did in no manner hinder or prevent them from making a proper delivery of the ice, or interfere with or disturb them in the fulfilment of any stipulation contained in their contract with its owners. As soon as the vessel reached New Orleans with the cargo in safety on board of her, the time had arrived when the plaintiffs were bound by the terms of their contract to complete the performance of it by the immediate delivery of the ice to the consignees, to whom in the bill of lading it was directed. The nature and qualities of the article were such as to require the most prompt and careful attention for its preservation; without which there was imminent danger, in the hot climate to which it was carried, that it would soon waste and perish, and become entirely valueless. In that condition of things, when the property could be saved from present destruction only by the immediate removal of it to houses properly prepared for its reception and storage, the plaintiffs not only did not proceed to perform their contract by delivering the ice to the consignees, but they had no power to do anything of that kind. It had already been taken away, and was then withheld, from them by force and violence, and they were never afterwards permitted by the captors to have anything to do with its custody, preservation or disposal; and from the

moment of its seizure at the mouth of the Mississippi they ceased to have possession of it. They had certainly the right of possession, but this only for the purpose of being able to perform their contract by delivering it to the consignees. This right they never exercised, nor does it appear that they ever attempted to exercise it. But upon the arrival of the ice at New Orleans, the consignees, by virtue of the consignment and the directions of the owners, were entitled to have immediate possession of it. It was then, when the plaintiffs had not only failed to deliver, but having, by a force which they could not resist or overcome, been wholly disabled from doing so, made no offer or attempt to deliver it, that the consignees, in the exercise of their own rights, obtained possession of it from the captors on the only terms upon which, under existing circumstances, it could be obtained. Thus it clearly appears that they did not by any act or proceeding on their part interfere with the plaintiffs in the performance of their contract, or hinder or prevent them from making a due and proper delivery of the ice to the parties entitled to receive it.

It is equally certain that the plaintiffs have failed to show that the possession obtained by Bosworth & Co. from the captors was equivalent, in substance or effect, to a delivery to them of the ice by the carriers, under the bill of lading. It is of course impossible to say exactly what would have been the consequences resulting from the complete performance of their contract by the plaintiffs. The consignees would, however, in that case have had the absolute possession of the ice, and might have realized its full value without molestation or disturbance; perhaps in the absence of all evidence upon the subject it ought to be presumed that they would. They would at least in such case have had a plain and indisputable right of action against any one who should have unlawfully interfered with their use or disposal of it. Of these, and of whatever other advantages they might in that contingency have acquired, they have been wholly deprived by the omission of the plaintiffs to perform their contract. And for these losses they have received no benefits in return. It is admitted that the possession

Tirrell & others *v.* Gage & others.

which they obtained in fact availed them nothing, and that they have never realized any real or substantial advantage from the possession, use or disposal of the ice.   It is therefore manifest that the possession obtained by Bosworth & Co. cannot be considered as equivalent to, or a legal and sufficient substitute for, a delivery of it to the consignees under the bill of lading, and according to the terms of the contract.

If the defendants had committed any trespass upon the prop·erty of the plaintiffs, or had in any particular violated their rights, or if, in rescuing the ice from the illegal captors of it, they had succeeded, by converting it to their own use, in realizing the whole or any substantial part of its value, the plaintiffs would have had a just claim in equity to a share of the avails, in proportion to their interest, as a compensation for the services which they had performed.   But there is no foundation in the facts upon which any such supposition can be entertained.   Nothing of that kind occurred ; no such circumstances ever existed.   It has already been shown that, upon the arrival of the ice at New Orleans, Bosworth & Co. were entitled, under the consignment and the orders and directions of the owners, to its immediate possession.   And finding it there in the hands of trespassers, and that the plaintiffs, oppressed by overpowering force, were then utterly unable to regain, or deliver, or to exercise any control over it, it was the right, and it would seem also to have been the positive duty of the consignees, to endeavor, by all the means they could command, to recover, and, if possible, to secure it for those to whom it justly belonged, or who had any lawful interest in it.   This they did, and this is all that they did.   No one would contend, that if, in an honest effort to rescue the property and secure it for the benefit of those to whom it rightfully belonged, they had succeeded by any other means, as for instance by their own strength, or by the exertion of any force they could command, in obtaining temporary possession of it from the trespassers, and the latter had thereupon immediately afterwards retaken it from them by irresistible violence, they would in such a contingency have been responsible, in any form of action, either to the owners or the carriers, for its value.   And yet this

is, in substance and reality, exactly what actually occurred. In the end, they were overpowered and utterly defeated, saving nothing for others and gaining nothing for themselves by the attempt they made. It is not denied that they acted in perfect good faith, or suggested that, by any course other than that which they pursued, they could possibly have got possession of the ice. But on the other hand it is admitted that, owing to the temporary predominance of the insurgents then in the irresistible exercise of the powers of the lawful government which they had usurped, all the efforts of the consignees proved fruitless and unavailing. Under such circumstances, it would not be in accordance, but in palpable conflict, with the dictates of justice and equity, to impose upon them the loss inflicted upon the plaintiffs by the lawless marauders who seized, and afterward procured in the Confederate States court the condemnation of, their ship and the cargo which it bore, and thus deprived all parties having an interest in the property of their legal rights.

It ought in this connection to be particularly noticed, that the consignees do not at all place their defence to this action upon the ground that the decree of condemnation and the judgment rendered on their bond were valid, or that the tribunal in which they were pronounced was possessed of any legitimate authority. They rely only upon the admitted fact of its actual existence, and that its proceedings, upheld for the time being by paramount force, and combined with the acts of violence perpetrated by the captors of the plaintiffs' ship, subjected them to such duress as to render the rescue and preservation of the property by them, or the conversion of its avails to their own use, an absolute impossibility. And it is obvious from all the admitted facts and circumstances that they acted under this duress equally when they gave the bond required by the persons holding the Confederate States court; for without having done so, in compliance with terms dictated by those who had the power to insist upon their observance, they could not have obtained possession of the ice; — and when they paid the judgment rendered upon it; for they paid it, not because they recognized it as a lawful judgment, but because the payment was compelled

by coercion, to which they could oppose no effectual resistance.

In the opinion of the court, it is a just and necessary conclusion from all these considerations that the plaintiffs have no cause of action against either the owners or consignees, and therefore that judgment must be rendered in each of these cases for the defendants.